1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

KRYSTAL REED, individually, and  on behalf of all others similarly situated,

               Plaintiff,

    vs.

BRIDGE DIAGNOSTICS, LLC, a California; and DOES 1 to 10, inclusive,

              Defendants.

Case No. 8:21:cv-01409-CJC-KES

**JUDGMENT OF FLSA SETTLEMENT**

Complaint Filed: September 10, 2021
Trial Date: None set

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Court, having granted approval of the FLSA Settlement in this matter on June 13, 2023, a true and correct copy of which is attached as Exhibit A, (the "Order"), hereby takes the following further action:

The Court hereby ORDERS, ADJUDGES AN DECREES that Judgment in this matter is entered in accordance with the Order and the Parties Settlement Agreement. The Court will retain jurisdiction over the parties to enforce the terms of the settlement pursuant.

IT IS SO ORDERED.

DATED: July 27, 2023

HON. CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

[PROPOSED] ORDER STAYING THE CASE AND TOLLING SOL

# JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| KRYSTAL REED, individually, and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> BRIDGE DIAGNOSTICS, LLC, and DOES 1 to 10, inclusive, <br><br> Defendants. | Case No.: SACV 21-01409-CJC (KESx) <br><br><br> ORDER GRANTING IN SUBSTANTIAL PART PLAINTIFF'S MOTION FOR APPROVAL OF FLSA SETTLEMENT AND APPROVAL OF SERVICE PAYMENT, ADMINISTRATION FEES AND ATTORNEYS' FEES AND COSTS [Dkt. 31] |

## I.     INTRODUCTION

On August 30, 2021, Plaintiff Krystal Reed brought this putative collection action against her former employer, Defendant Bridge Diagnostics, LLC, and unnamed Does. (*See* Dkt. 1 [Complaint].)  Reed asserted claims under section 16 of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 216, and under analogous provisions of Illinois law.  (*See* Dkt. 25 [First Amended Complaint, hereinafter "FAC"].)  Now before

the Court is Reed's motion for approval of the FLSA settlement and of an incentive award, administration fees, and attorneys' fees and costs.  (*See* Dkt. 31 [Plaintiff's Notice of Motion for Approval of FLSA Settlement and Approval of Service Payment, Adminstration (sic) Fees and Attorneys' Fees and Costs]; Dkt. 30 [Unopposed Motion for FLSA Settlement Approval and Approval of Service Payment, Administration Fees and Attorneys' Fees and Costs, hereinafter "Mot."].)  For the following reasons, the motion is **GRANTED IN SUBSTANTIAL PART**.

I.   **BACKGROUND**

Reed alleged that she worked for Bridge Diagnostics as a field operations technician from about November 2020 to March 31, 2021.  (*See* FAC ¶ 7.)  During that time, Reed was subject to the employment practice of Bridge Diagnostics not to pay overtime for all hours worked in excess of forty hours per week.  (*See id.* ¶¶ 7, 16–19.)  Specifically, she and other employees spent off-the-clock time in group chats, including during meal periods, and thus worked in excess of forty hours in a workweek without receiving at least one and a half times her regular rate of pay and without receiving minimum wages owed.  (*See id.*)  She also alleges that Bridge Diagnostics failed to reimburse her and other employees for use of their personal cell phones.  (*See id.* ¶ 20.)

After Reed initiated this action and in preparation for mediation, Bridge Diagnostics provided Reed and her counsel time and pay records for Reed and a sample of forty other employees as well as company policies and data points regarding the class members.  (*See* Dkt. 30-1 [Declaration of Ian M. Silvers in Support of Motion for Approval of FLSA Settlement and Approval of Service Payment, Adminstration (sic) Fees and Attorneys' Fees and Costs, hereinafter "Silvers Decl."] ¶ 10.)  Those records indicated that there were about 254 affected employees in total through March 8, 2021,

and that these employees worked a cumulative 5,024 workweeks.  (*See id.*)  Reed's counsel also interviewed other employees.  (*See id.* ¶ 15.)

Reed retained an expert witness to review the records and generate estimates for the putative collective claims.  (*See id.* ¶ 11.)  Assuming forty-five minutes per employee per workday of off-the-clock work, the expert estimated that there were $299,617.79 in total wages at issue for the FLSA claims as of the date of mediation.  (*See id.* ¶ 16.)  The expert further attributed $41,005.37 to the lack of reimbursement for the use of personal cell phones for work as of the date of mediation, though the failure to reimburse apparently ceased in November 2021 after the lawsuit was filed.  (*See id.* ¶ 17.)

The parties participated in a mediation in April 2022, and while it was initially unsuccessful, subsequent negotiations through and discussions with the mediator resulted in a settlement agreement.  (*See id.* ¶ 12.)  The settlement agreement provides that Bridge Diagnostics will fund a gross settlement amount equaling $298,500, from which the individual settlements for Reed and the other members of the putative FLSA collective are to be disbursed after certain deductions are made.  (*See id.* Ex. 2 [Collective Settlement Agreement for All Claims, hereinafter "Agmt."] ¶¶ 2(o), 23–24.)  Those deductions include (1) an incentive award for Reed equaling $5,000, (2) administration costs, not to exceed $12,500, and (3) attorneys' fees and costs, not to exceed $99,500 (i.e., one third of the gross settlement amount) and $25,000, respectively.  (*See id.* ¶¶ 2(m), 24.)

The resulting net settlement amount is to be distributed to individuals who performed work for Bridge Diagnostics or under its supervision through Biophase during the collective period who opt into the settlement.  (*See id.* ¶¶ 2(*l*), 16, 24(d).)  The individual settlement amounts are apportioned on a pro rata basis—that is, based on the number of weeks that each member worked during the collective period relative to the

total number of weeks that all members worked during the period.  (*See id.* ¶¶ 2(t), 26.)
The collective period is from June 29, 2020, through the date of the order granting
approval of the settlement.  (*See id.* ¶ 2(f).)  Half of each settlement amount is deemed
wages, and the other half is deemed a non-wage amount, including penalties.  (*See
id.* ¶ 26.)

Bridge Diagnostics is to send the claims administrator within seven days of
settlement approval, among other things, a list of all eligible members, their last known
physical and email addresses and telephone numbers, their work locations, and the total
numbers of qualifying workweeks.  (*See id.* ¶ 25.)  The administrator will use this
information to mail each eligible person a settlement check.  (*See id.*)

If an individual opts into the settlement by cashing the check, the individual
releases Bridge Diagnostics and all its past, present, and future parent companies,
subsidiaries, divisions, related, associated and affiliated companies, shareholders,
officers, directors, employees, agents, attorneys, insurers, reinsurers, successors, and
assigns of specified wage-and-hour claims.  (*See id.* ¶¶ 2(v), 16–17.)  The claims include
those "that were . . . or could have been brought based on the facts alleged in the Lawsuit
for the entire Collective Period including those arising under the FLSA or parallel state
law, including the IMWL, IWPCA, California Labor Code, or the claims that could have
been plead . . . during the Collective Period."  (*Id.* ¶ 17; *see also id.* [specifying the
"Illinois Minimum Wage Law, Illinois Wage Payment and Collection Act, and wage and
hour claims for violations of California wage and hour laws under California Labor Code
Sections 201-203, 226, 226.7, 510, 512,1194,1194.2, and 2802"].)

On the reverse side of each check above the space for endorsement will be printed
the following release language:

> By negotiating and cashing this check: (1) I agree to be bound by the Settlement Agreement reached in *Krystal Reed v. Bridge Diagnostics, LLC* 8:21-cv-01409 (C.D. Cal.) ("the Lawsuit"); (2) I consent to be a party-plaintiff in the Lawsuit under § 216(b) of the Fair Labor Standards Act (the "FLSA"); and (3) I release any and all wage and hour claims for the period from June 29, 2020 to [the date of the Order Granting Approval of the Settlement] that were brought or could have been brought in the lawsuit against Bridge Diagnostics, LLC, under the Fair Labor Standards Act and/or any federal or state wage and hour statutory or common law based on the facts alleged in the Lawsuit.

(*Id.* ¶ 19 [alteration in original].)  Each settlement check also will bear a legend indicating to the bank receiving it that the bank should accept it only if the payee has endorsed it and the settlement and release language has not been altered or deleted.  (*See id.* ¶ 20.)  Any eligible settlement member who does not cash the check within one hundred twenty days after the administrator mails the notice packet will not be bound by the terms of the release.  (*See id.* ¶¶ 2(a), 27.)  The agreement further includes a general release by Reed as the named plaintiff.  (*See id.* at 7–8.)

## II.   FLSA COLLECTIVE CERTIFICATION

The FLSA was enacted to protect workers from substandard wages and oppressive working hours.  *See Barrentine v. Arkansas–Best Freight System*, 450 U.S. 728, 739 (1981).  Under the FLSA, "one or more employees" may file a civil action—termed a collective action—"in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  Unlike a class action under Federal Rule of Civil Procedure 23, to participate in a collective action, an employee is required to give consent in writing.  *See* 29 U.S.C. § 216(b); *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (rights in a collective action under the FLSA are dependent on the employee receiving accurate and timely notice about the pendency of the collective action, so that the employee can make informed decisions about whether to participate).  "If an employee does not file a written consent, then that employee is not bound by the outcome

of the collective action." *Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 989 (C.D. Cal. 2006).

"When the parties seek settlement approval of an FLSA collective action claim before seeking certification of a collective action, courts in this circuit first consider whether certification is appropriate and then whether the proposed settlement is substantively acceptable." *Kempen v. Matheson Tri-Gas, Inc.*, 2016 WL 4073336, at *4 (N.D. Cal. Aug. 1, 2016). In *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018), the Ninth Circuit specified a two-step approach to determine whether an FLSA collective action should be certified. The first step requires the Court to "make an initial 'notice-stage' determination of whether potential opt-in plaintiffs are 'similarly situated' to the represented plaintiffs." *Id.* at 1110. "The purpose of this initial step is to determine whether the collective action should be certified for the sole purpose of sending notice of the action to potential class members." *Id.* (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)). According to the Ninth Circuit, "[p]arty plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Campbell*, 903 F.3d at 1117. After the collective has received notice and discovery has been concluded, the second step allows employers to move for decertification by showing that the 'similarly situated' requirement has not been satisfied. At that point, the court "engages in a more stringent inquiry into the propriety and scope of the collective action." *Labrie v. UPS Supply Chain Sols., Inc.*, No. C08–3182, 2009 WL 7235599, at *4 (N.D. Cal. Mar. 18, 2009).

Applying the *Campbell* framework, the Court finds that certification of the proposed FLSA collective is appropriate. Reed defines the persons eligible to be part of the collective as "the Named Plaintiff and all individuals who performed work for Defendant or under Defendant's supervision through Biophase at any point between June

29, 2020, and the date of the Order Granting Approval of the Settlement as non-exempt employees." (Agmt. § 2(*l*).) Reed asserts that the collective includes approximately 254 individuals, each of whom worked for Bridge Diagnostics. (*See id.*; Mot. at 8.) The members of the proposed FLSA collective are thus similarly situated, because they were all employed by Bridge Diagnostics and were all subject to its alleged practice or policy of failing to compensate employees for off-the-clock work and for use of personal cell phones. The Court is satisfied as a preliminary matter that the "putative 'party plaintiffs are alike in ways that matter to the disposition of their FLSA claims,' as they held similar jobs with similar functions and were uniformly subject to [Defendant's] compensation policies that led to the alleged FLSA violations here, presenting 'similar issue[s] of law or fact material to the disposition of their FLSA claims.'" *Smothers v. NorthStar Alarm Servs., LLC*, No. 17-cv-00548, 2019 WL 280294, at *8 (E.D. Cal. Jan. 22, 2019) (quoting *Campbell*, 903 F.3d at 1117). Accordingly, the action may proceed as a collective.

## III. FLSA COLLECTIVE ACTION SETTLEMENT

Employees may not settle and release FLSA claims against an employer without obtaining the approval of either the Secretary of Labor or a district court. *See Seminiano v. Xyris Enter., Inc.*, 602 F. App'x 682, 683 (9th Cir. 2015); 29 U.S.C. § 216(b), (c). The Ninth Circuit has not set forth specific criteria for courts to consider when evaluating an FLSA settlement. As a result, district courts in the Ninth Circuit frequently rely on the Eleventh Circuit's standard in *Lynn's Food Stores v. United States*, 679 F.2d 1350 (11th Cir. 1982). *See, e.g.*, *McClure v. Waveland Servs., Inc.*, No. 18-cv-01726, 2021 WL 5204151, at *2 (E.D. Cal. Nov. 9, 2021); *Hernandez v. Dutton Ranch Corp.*, No. 19-cv-00817, 2021 WL 5053476, at *3 (N.D. Cal. Sept. 10, 2021); *Pike v. County of San Bernardino*, No. EDCV 17-1680, 2019 WL 8138439, at *2 (C.D. Cal. Nov. 25, 2019); *Dunn v. Teachers Ins. & Annuity Ass'n of Am.*, No. 13-cv-05456, 2016 WL 153266, at *3 (N.D. Cal. Jan. 13, 2016). Under that standard, a court may not approve an FLSA

settlement unless (1) the employee's claim involves a "bona fide dispute" over FLSA liability, and (2) the settlement is a fair and reasonable resolution of that dispute. *Lynn's Food Stores*, 679 F.2d at 1353.

### A.    Bona Fide Dispute

"A bona fide dispute exists when there are legitimate questions about the existence and extent of the defendant's FLSA liability." *Jennings v. Open Door Mktg., LLC*, No. 15-cv-04080, 2018 WL 4773057, at \*4 (N.D. Cal. Oct. 3, 2018); *see also Kerzich v. Cty. of Tuolumne*, 335 F. Supp. 3d 1179, 1184 (E.D. Cal. 2018); *Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1174 (S.D. Cal. 2016).

This case presents a bona fide dispute over whether Bridge Diagnostics violated the FLSA by failing to provide full compensation for off-the-clock work and for use of personal cell phones.  The parties have investigated Reed's claims through informal discovery, disclosures between the parties in advance of mediation, and discussions with other employees of Bridge Diagnostics.  (*See* Silvers Decl. ¶ 15; Agmt ¶ 7.)  Bridge Diagnostics denies that any required off-the-clock work occurred.  (*See* Silvers Decl. ¶ 18; Agmt. ¶ 8.)  Bridge Diagnostics further argues that the number of hours would be nowhere near the amount that Reed contends even if there were individual, unsanctioned off-the-clock work, that the liquidated damages that Reed seeks are not recoverable because of the good-faith defense under 29 U.S.C. § 260, that there is no evidence that Bridge Diagnostics encouraged employees to work off the clock, and that any such work if it occurred would be in violation of Bridge Diagnostics policies.  (*See* Silvers Decl. ¶ 18; Agmt. ¶ 8.)  There are thus "legitimate questions about the existence and extent of [D]efendant's FLSA liability." *Jennings*, 2018 WL 4773057, at \*4.

//

//

**B.      Fair and Reasonable Resolution**

The next consideration is whether the settlement agreement reflects a fair and reasonable resolution of the asserted claims.  In making this determination, courts "often apply factors for assessing a proposed class action settlement pursuant to Federal Rule of Civil Procedure 23," while "recogniz[ing] that some of the Rule 23 factors do not apply because of the inherent differences between class actions and FLSA actions."  *Dashiell v. County of Riverside*, No. EDCV 15-00211, 2018 WL 3629915, at *2 (C.D. Cal. July 19, 2018).  Under that rule, a proposed settlement must be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Rule 23 requires evaluating whether (A) the class representatives and class counsel have adequately represented the class, (B) the proposal was negotiated at arm's length, (C) the relief provided for the class is adequate, and (D) the proposal treats class members equitably relative to each other.  *See* Fed. R. Civ. P. 23(e)(2)(A)–(D).

Because applying only the Rule 23 factors "runs the risk of not giving due weight to the policy purposes behind the FLSA," district courts in this circuit have also "adopted a totality of circumstances approach that emphasizes the context of the case and the unique importance of the substantive labor rights involved."  *Selk*, 159 F. Supp. 3d at 1173.  This approach considers many of the factors relevant to Rule 23 class action settlements, "but adjusts or departs from those factors when necessary to account for the labor rights at issue."  *Id.*  The factors courts consider are (1) the plaintiff's range of possible recovery, (2) the stage of proceedings and amount of discovery completed, (3) the seriousness of the litigation risks faced by the parties, (4) the scope of any release provision in the settlement agreement, (5) the experience and views of counsel and the opinion of participating plaintiffs, and (6) the possibility of fraud or collusion.  *See id.* Ultimately, the Court must be "satisfied that the settlement's overall effect is to vindicate,

rather than frustrate, the purposes of the FLSA." *Kerzich*, 335 F. Supp. 3d at 1185 (quoting *Selk*, 159 F. Supp. 3d at 1173).

Here, the Rule 23 factors and the totality of the circumstances support approval of the Settlement Agreement.

### 1.     Rule 23 Analysis

#### a)     Adequate Representation

Adequacy of representation requires that the named representatives (1) have no interests antagonistic to the interests of the collective and (2) are represented by counsel that is capable of vigorously prosecuting their interests. *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 618 (N.D. Cal. 2015). Reed and her counsel have adequately represented the interests of the FLSA collective. There is no indication that Reed has any interests antagonistic to the interests of the collective. Further, counsel have substantial experience in litigating representative actions like this, (*see* Silvers Decl. ¶¶ 3–7; Dkt. 30-2 [Declaration of Michael L. Fradin in Support of Motion FLSA Settlement Approval and Approval of Service Payment, Adminstration (sic) Fees and Attorneys' Fees and Costs, hereinafter "Fradin Decl."] ¶ 12), and have prosecuted Reed and the collective's interests with the appropriate degree of vigor. This factor weighs in favor of approval.

#### b)     Arm's Length Negotiations

The next consideration is whether the settlement agreement was the result of arm's length negotiations. *See* Fed. R. Civ. P. 23(e)(2)(B). This factor reflects a "procedural concern[ ], looking to the conduct of the litigation and of the negotiations leading up to

the proposed settlement."  Fed. R. Civ. P. 23(e)(2)(A)–(B) advisory committee's note to 2018 amendments.  Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that [the FLSA collective's] counsel have allowed pursuit of their own self-interests and that of certain [collective] members to infect the negotiations."  *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011); *see Selk*, 159 F. Supp. 3d at 1180 (applying *Bluetooth* in FLSA collective settlement approval); *Jennings*, 2018 WL 4773057, at *8 (same); *Slezak v. City of Palo Alto*, 2017 WL 2688224, at *5 (N.D. Cal. June 22, 2017) (same).

The Court previously raised for the parties' attention what appeared to be two of the subtle signs of potential collusion in the parties' agreement—namely, "a 'clear sailing arrangement,' under which the defendant agrees not to challenge a request for an agreed-upon attorney fee, and . . . a 'kicker' or 'reverter' clause that returns unclaimed funds to the defendant rather than to the collective.  (Dkt. 33 [Order Requiring Supplemental Briefing on Plaintiff's Motion for Approval of FLSA Settlement and Approval of Service Payment, Adminstration (sic) Fees and Attorneys' Fees and Costs, hereinafter "Supp. Br. Order"] at 2 [quoting *Bluetooth*, 654 F.3d at 947].)  The presence of these kinds of provisions, however, is not a "death knell"; rather, it means that a court must scrutinize the agreement for signs that the fees counsel requests are unreasonably high.  *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021).  Specifically, the Court must "'peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to [the collective members],' even when the settlement has been negotiated 'with a neutral mediator before turning to fees.'"  *Kim*, 8 F.4th at 1180 (citation omitted).

The agreement withstands such scrutiny.  First, on supplemental briefing, the parties have submitted an amendment to their agreement which provides that uncashed funds will no longer "be[] returned to [Bridge Diagnostics]" and instead "will be redistributed to those individuals who did cash their checks (and thus opted into the

settlement) on a pro rata basis through a second distribution." (Dkt. 34 [Supplemental Declaration of Ian M. Silvers in Support of Motion for Approval of FLSA Settlement and Approval of Service Payment, Adminstration (sic) Fees and Attorneys' Fees and Costs] ¶ 6; *id.* Ex. A [Amendment to Collective Settlement Agreement for All Claims].) Second, the inference of collusion from a clear sailing arrangement is diminished when plaintiff counsel's fees are "to be made from the settlement fund," *Rodriguez v. W. Pub'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009), and "when the agreement lacks a reversionary or 'kicker provision,'" *In re Toys "R" Us-Del., Inc.—Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014) (citation omitted). With the amendment to the agreement, this is indeed the case here. Third, "[p]articipation in mediation prior to a settlement 'tends to support the conclusion that the settlement process was not collusive.'" *Milan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015) (citation omitted); *see also In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018).

The Court is sufficiently satisfied that the settlement agreement was negotiated at arm's length. Accordingly, this factor weighs in favor of approval.

### c)      Adequate Relief

Whether a settlement is adequate requires consideration of several factors, including (1) "the costs, risks, and delay of trial and appeal," (2) "the effectiveness of any proposed method of distributing relief to the [collective], including the method of processing [collective]-member claims," (3) "the terms of any proposed award of attorney's fees, including timing of payment," and (4) "any agreement required to be identified under Rule 23(e)(3)," namely, "any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(2)(C), (e)(3).

### (i)    Costs, Risks, and Delay

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 4 A Conte & H. Newberg, *Newberg on Class Actions*, § 11:50 at 155 (4th ed. 2002)).  In assessing the risk, expense, complexity, and likely duration of further litigation, courts should consider "the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Id.* (quoting *Oppenlander v. Standard Oil Co. (Ind.)*, 64 F.R.D. 597, 624 (D. Colo. 1974)).

The seriousness of the litigation risks faced by the parties weighs in favor of approval.  As discussed, Bridge Diagnostics denies that any required off-the-clock work occurred, contests the number of hours that would have been off-the-clock had any such work occurred, raises a good-faith defense, disputes the existence of adequate evidence, and proffers that its policies prohibited off-the-clock work.  (*See* Silvers Decl. ¶ 18; Agmt. ¶ 8.)  Bridge Diagnostics also "would [have] argue[d] against collective certification and for decertification of the FLSA collective based on items including the differences among various employees." (Mot. at 9.)  These issues indicate that "there is a significant risk that litigation might result in a lesser recovery for the class or no recovery at all." *Jennings*, 2018 WL 4773057, at \*5 (citation omitted); *see also Selk*, 159 F. Supp. 3d at 1175 (finding that this factor weighed in favor of approval when there was a strong argument that the defendant had not violated the FLSA and a "real possibility that Defendant would successfully decertify one or both of the classes").

The settlement also appears reasonable when considering the costs and risks in the context of the potential recovery.  As noted, Reed's expert witness reviewed a sample of

Bridge Diagnostics records and estimated based on the number of affected employees that the FLSA claims entailed a potential recovery of $299,617.79 in wages and further attributed $41,005.37 to the lack of reimbursement for the use of personal cell phones for work.  (*See* Silvers Decl. ¶¶ 11, 16–17.)  With the liquidated damages that Reed seeks, the potential recovery for the off-the-clock wages would be $599,225.58 at most.  (*See* Mot. at 9.)

Reed admittedly does not estimate the recovery under the analogous provisions of Illinois law that she asserted in the FAC.  But the conduct giving rise to the state law claims is the same as that giving rise to the FLSA claims, and the settlement fund totals $298,500—nearly one half of the potential recovery for the FLSA claims if including liquidated damages.  *See Julio v. Anthony, Inc.*, No. CV 14-03172, 2015 WL 13919364, at *5 (C.D. Cal. June 24, 2015) (finding reasonable class award representing approximately 55% of the forecasted recovery); *Stovall-Gusman v. W.W. Granger, Inc.*, No. 13–cv–02540, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (finding reasonable a settlement amount "represent[ing] approximately 10% of what [the] class might have been awarded had they succeeded at trial"); *Ma v. Covidien Holding, Inc.*, SACV 12–02161, 2014 WL 360196, at *5 (C.D. Cal. Jan. 31, 2014) (finding a settlement worth 9.1% of the total value of the action "within the range of reasonableness").  Accordingly, the Court believes that the settlement offers collective members real, tangible relief while avoiding the time, expense, and risk of further litigation.  This factor weighs in favor of approval.

### (ii)    Proposed Method of Distributing Relief

"Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims."  Fed. R. Civ. P. 23(e)(2)(C)–(D) advisory committee's note to 2018 amendments.  "A claims processing

method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id.*

The parties' proposed method of distributing relief is appropriately tuned to ensure genuine collective members receive relief. The administrator is to receive from Bridge Diagnostics a list of all eligible members, their last known physical and email addresses and telephone numbers, their work locations, and the total numbers of qualifying workweeks. (*See* Agmt. ¶ 25.) The administrator will use this information to mail each collective member a notice and settlement check, which the member may accept by cashing the check at the member's discretion. (*See id.*) The failure of a member to cash a check in a timely manner does not release that person's claims. (*See id.* ¶ 27.) The individual settlement amounts are to be determined based on the pro rata share of each member's workweeks during the collective period relative to the total number of weeks of the collective as a whole. (*See id.* ¶ 26.) This method of distribution is adequate and thus weighs in favor of approval.

### (iii)   Award of Attorneys' Fees

The next factor in the adequacy analysis consists of "the terms of any proposed award of attorney's fees." Fed. R. Civ. P. 23(e)(2)(iii); *see also* 29 U.S.C. § 216(b) ("The court [FLSA actions] shall . . . allow a reasonable attorney's fee to be paid by the defendant . . . ."). Central to this analysis is the extent to which the fee is "disproportionate." *Bluetooth*, 654 F.3d at 947. In addition to proportionality, courts must scrutinize an agreement for any "clear sailing arrangement" or "'kicker' or 'reverter' clause." *Briseño v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1023 (9th Cir. 2021) (cleaned up). The amended Rule 23(e) also instructs courts to consider the "timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). Even though greater skepticism is appropriate in settlements reached before formal certification, "courts should [not]

unnecessarily meddle in [] settlements negotiated by the parties." *Briseño*, 998 F.3d at 1027; *see also Staton*, 327 F.3d at 952 ("Judicial review . . . takes place in the shadow of the reality that rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk.").

The agreement provides that attorneys' fees for Reed's counsel are not to exceed one third of the settlement fund, or $99,500.00. (*See* Agmt. ¶ 24(b).) The exact amount to award within that range is a related but distinct inquiry—one that the Court takes up *infra* section III(E)—but it suffices to say here that the terms of the proposed award caution toward approval.

First, as noted earlier, members faced real risk in not recovering much (or any) of the relief that Reed initially sought, there is no reverter clause considering the parties' amendment to the agreement, and the risk posed by a clear sailing arrangement is minimized in the absence of a reverter clause and by the fact that this matter was mediated by a neutral third party.

Second, separate and apart from the amounts that courts actually award counsel pursuant to settlement agreements, courts often approve agreements that provide for a fee award of up to about one third of the relevant settlement fund. *See In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) (approving settlement agreement when counsel sought fees and costs that "collectively represent[ed] 32% of the settlement fund"); *Ogbuehi v. Comcast of Cal./Colo./Fla./Oreg., Inc.*, 303 F.R.D. 337, 352 (E.D. Cal. 2014) ("Because 33.33 percent is within the accepted range set forth by the Ninth Circuit, the fee amount proposed is approved preliminarily.").

Third, the timing of payment seems appropriate.  Bridge Diagnostics is obligated to send information regarding collective members to the administrator within seven days of approval of the settlement, after which the administrator can begin the process of mailing settlement checks to the members, while counsel are to be paid within fourteen days of approval.  (*See* Agmt. ¶¶ 24(b), 25.)  Accordingly, this factor weighs in favor of approval.

### (iv)   Agreements Made in Connection with the Proposal

A court must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in connection with the proposal," *id.* 23(e)(3).  The parties have identified no agreement other than the proposed settlement agreement discussed herein.

### d)   Equitable Treatment

Courts must also consider whether the proposed settlement "treats [collective] members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  "Matters of concern could include whether the apportionment of relief among [collective] members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23(e)(2)(C)–(D) advisory committee's note to 2018 amendments.

The agreement treats collective members equitably relative to each other.  It provides that individual settlement amounts are to be apportioned on a pro rata basis based on the collective members' workweeks during the collective period relative to the total workweeks of the collective.  (*See id.* ¶ 26.)  This is a fair way to divide the settlement proceeds, as it ensures that those who worked more (and thereby suffered

more injury due to the alleged misconduct of Bridge Diagnostics) recover more.  This weighs in favor of approving the settlement.  *See McClure v. Waveland Servs., Inc.*, No. 18-cv-01726, 2021 WL 5204151, at *4 (E.D. Cal. Nov. 9, 2021) (finding equitable treatment in FLSA settlement when the amount each member received was "determined by the number of weeks each worked for defendant"); *In Re Snap Inc. Sec. Litig.*, No. 2:17-cv-03679, 2021 WL 667590, at *2 (C.D. Cal. Feb. 18, 2021) (concluding that this factor favored approving the settlement when "there [was] no indication that the settlement favors certain members over others").

### 2.  Totality of the Circumstances Analysis

#### a)  Range of Possible Recovery

"A district court evaluates the plaintiff's range of potential recovery to ensure that the settlement amount agreed to bears some reasonable relationship to the true settlement value of the claims." *Selk*, 159 F. Supp. 3d at 1174.  "The settlement amount need not represent a specific percentage of the maximum possible recovery," but rather "in comparing the amount proposed in the settlement with the amount that plaintiffs could have obtained at trial, the court must be satisfied that the amount left on the settlement table is fair and reasonable under the circumstances presented." *Id.*  As the Court discussed in the Rule 23 analysis of the adequacy of the relief afforded to collective members, (*see supra* § III(B)(1)(c)(i)), there were real risks to continuing the action without a settlement, and the agreement affords the collective members meaningful relief. Thus, for the reasons discussed therein, the Court concludes that the settlement amount is reasonable and in keeping with the range of reasonableness.

//

//

//

**b)      Stage of Proceedings and Amount of Discovery Completed**

Courts are "more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (cleaned up).  Here, Reed's counsel investigated the facts of this case through informal discovery and mediation, including reviewing Bridge Diagnostics employment records and interviewing Reed and other collective members as well as hiring an expert to review the records and estimate the potential recovery.  This factor therefore weighs in favor of approval.

**c)      Litigation Risks**

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 3 Newberg on Class Actions § 11:50 (4th ed. 2012)).  In assessing the risk, expense, complexity, and likely duration of further litigation, courts should consider "the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Id.* (quoting *Oppenlander*, 64 F.R.D. at 624).  The Court's earlier discussion of the risks of litigation in the Rule 23 analysis, (*see supra* § III(B)(1)(c)(i)), applies equally here.  Accordingly, this factor weighs in favor of approval.

**d)      Scope of Settlement Agreement's Release Provision**

An FLSA release should not go beyond the specific FLSA claims at issue in the lawsuit itself.  *See Slezak*, 2017 WL 2688224, at *4.  Indeed, courts "routinely reject

FLSA settlements when the scope of the release goes beyond the overtime claims asserted in the complaint." *Dunn*, 2016 WL 153266, at *5. The goal is to "ensure that [collective] members are not pressured into forfeiting claims, or waiving rights, unrelated to the litigation." *Selk*, 159 F. Supp. 3d at 1178. The settlement agreement's release is "limited to wage and hour claims base on the allegations in the operative complaint." (Mot. at 17.) Specifically, the collective members agree to release "all wage and hour claims that were brought or could have been brought based on the facts alleged in the Lawsuit for the entire Collective Period including those arising under the FLSA or parallel state law." (Agmt. ¶ 17.) The limited scope of the release provisions weighs in favor of approval.

### e)   Counsel's Experience and Views

"In determining whether a settlement is fair and reasonable, the opinions of counsel should be given considerable weight both because of counsel's familiarity with the litigation and previous experience with cases." *Slezak*, 2017 WL 2688224, at *5 (cleaned up). "As the Ninth Circuit has emphasized, parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Selk*, 159 F. Supp. 3d at 1176 (cleaned up). As noted, Reed's counsel have substantial experience in representative actions like this one. (*See* Silvers Decl. ¶¶ 3–7; Fradin Decl. ¶ 12.) Counsel believe that the settlement is fair, adequate, and reasonable and should, therefore, be approved. (*See* Silvers Decl. ¶ 15; Fradin Decl. ¶¶ 14, 16.) This factor weighs in favor of approval.

### f)   Attorneys' Fees

"Where a proposed settlement of FLSA claims includes the payment of attorney's fees, the court must also assess the reasonableness of the fee award." *Selk*, 159 F. Supp.

3d at 1180.  For the same reasons in the Rule 23 analysis of the terms of the proposed award of attorneys' fees, (*see supra* § III(B)(1)(c)(iii)), this factor weighs in favor of approval.

### g)    Possibility of Fraud or Collusion

The possibility of fraud and collusion is minimal in this case for the reasons discussed above in the Rule 23 analysis regarding the arm's length negotiation of the settlement agreement.  (*See supra* § III(B)(1)(b).)  This factor thus weighs in favor of approval.

### C.    Costs Award

The settlement agreement provides that counsel may be reimbursed for litigation costs up to $25,000, (*see* Agmt. ¶ 24(b)), and counsel here request reimbursement for $20,948.70 in costs, (*see* Mot. at 24).  Attorneys are entitled to reimbursement of reasonable costs and expenses, which include "those out-of-pocket expenses that would normally be charged to a fee paying client."  *Harris v. Marhoefer*, 24 F.3d 16, 19–20 (9th Cir. 1994); *see also* 29 U.S.C. § 216(b) ("The court in [FLSA actions] shall . . . allow . . . costs of the action.").  Counsel have provided documentation to substantiate their costs, such as filing fees, service of process, mediation, retention of the expert, and the like. (*See* Silvers Decl. Ex. 4.)  These types of expenses are commonplace in litigation, and the amounts seem reasonable given the nature of this case and the history of the litigation. The Court therefore approves $20,948.70 in costs.

//
//
//
//

### D.   Settlement Administrator

Counsel further request that the Court approve Simpluris, Inc., as the claims administrator.  (*See* Mot. at 26.)  Simpluris has extensive experience in administering representative actions, including wage-and-hour actions.  Moreover, "[c]ourts regularly award administrative costs associated with providing notice" and issuing settlement awards.  *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015).  The settlement agreement provides for administration costs up to $12,500, (*see* Agmt. ¶ 24(c)), and Simpluris states that this "project has a fixed rate of $10,200.00," (Dkt. 30-4 [Declaration of Eric Springer on Behalf of Simpluris, Inc. (Proposed Settlement Administrator)] ¶ 13; *see also id.* Ex. C).  Because the services that Simpluris is to perform, including mailing notices and settlement checks to collective members, are reasonably necessary for effectuating the settlement, this request is approved.

### E.   Attorneys' Fee Award

When "counsel seek[] fees from a common fund," as is the case here, "courts have discretion to use one of two methods to determine whether the request is reasonable: 'percentage-of-the-fund' or 'lodestar/multiplier.'"  *Villalobos v. Calandri*, No. CV12-2615, 2016 WL 6901695, at *5 (C.D. Cal. Mar. 14, 2015) (quoting *In re Mercury Interactive Corp.*, 618 F.3d 988, 992 (9th Cir. 2010)); *see also Ferreri v. Bask Tech., Inc.*, No. 15-CV-1899, 2016 WL 7451665, at *4 (S.D. Cal. Dec. 28, 2016).  Counsel "request[] that the Court use the percentage method and award counsel 33 1/3 % of the settlement fund ($99,500)."  (Mot. at 23.)

Although the agreement permits fees in an amount up to one third of the settlement fund, (*see* Agmt. 24(b)), ordinarily, "25% of the fund [i]s the 'benchmark' for a reasonable fee award," *Bluetooth*, 654 F.3d at 942–43.  In deciding whether "'special

circumstances' justify[ ] a departure" from the benchmark, *id.* at 942, courts typically consider (1) the results achieved, (2) the risk of litigation, (3) the skill required and the quality of work, (4) the contingent nature of the fee and the financial burden carried by the plaintiff, and (5) awards made in similar cases, *see Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002).

The Court decides to award a fee of 25% of the gross settlement fund.  The issues in this case do not appear particularly complex, the case had not progressed into formal discovery or motion practice, and the settlement results are respectable but not stellar. Counsel do not argue in their brief the existence of any "'special circumstances' justifying a departure" from the benchmark, *Bluetooth*, 654 F.3d at 942 (citation omitted), nor does the Court see any such circumstances present.  Moreover, the Court decides to apply that percentage *after* deductions for counsel's and the administrator's costs, lest counsel not only be reimbursed for the costs but also receive an additional 25% of those costs as a fee.  *See In re Apple iPhone/iPad Warranty Litig.*, 40 F. Supp. 3d 1176, 1182 (N.D. Cal. 2014) (calculating a 25% fee from a net settlement fund after deducting administration costs); *Kmiec v. Powerwave Techs., Inc.*, No. SACV 12-00222, 2016 WL 5938709, at *5 (C.D. Cal. July 11, 2016) (calculating attorneys' fee from net settlement award after deducting costs and administrative expenses); *Kanawi v. Bechtel Corp.*, No. C 06–05566, 2011 WL 782244, at *3 (N.D. Cal. Mar. 1, 2011) (same).

Subtracting the $20,948.70 in litigation costs for counsel and the $10,200 in claims administration costs for Simpluris from the $298,500 gross settlement amount yields $267,351.30.  Applying the 25% benchmark rate to that sum yields $66,837.83. Accordingly, Reed's counsel are awarded $66,837.83 in attorneys' fees.

The Court also performs a "[c]alculation of the lodestar, which measures the lawyers' investment of time in the litigation," as the lodestar "provides a check on the

reasonableness of the percentage award." *Vizcaino*, 290 F.3d at 1050. The lodestar method for calculating attorneys' fees involves multiplying the "number of hours reasonably expended by a reasonable hourly rate." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998). That figure, which is the lodestar, may then be "adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id.*

Below are the timekeepers' respective hours expended on this action:

| Name | Role | Hours |
|---|---|---|
| Michael L. Fradin | Attorney | 98.2 |
| Ian M. Silvers | Attorney | 127.20 |
| Javier R. Ruiz | Paralegal | 34.2 |

(*See* Fradin Decl. Ex. 1; Silvers Decl. ¶¶ 4–7, 26, Ex. 3.)

The timekeepers expended 259.6 hours in total. Given that the parties engaged in informal discovery and participated in a mediation before reaching a settlement and given that the lodestar method is being used solely to cross-check the amount awarded under the percentage-of-the-fund method, the hours expended seem appropriate.

Below are the timekeepers' respective years of legal experience and hourly rates:

| Name | Role | Experience | Hourly Rate |
|---|---|---|---|
| Michael L. Fradin | Attorney | ? | $600 |
| Ian M. Silvers | Attorney | 17 years | $650 |
| Javier R. Ruiz | Paralegal | - | $250 |

(*See* Fradin Decl. Ex. 1; Silvers Decl. ¶ 25, Ex. 3.)

The reasonableness of the rates depends on "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1994).  The Court cannot verify that Michael L. Fradin's rates are reasonable, as he has not specified the number of years of legal experience that he has.  That said, the timekeepers' rates overall seem appropriate, at least when used solely for a lodestar cross-check.  Counsel attest that the rates are consistent with those of the broader market.  (*See* Fradin Decl. ¶ 20; Silvers Decl. ¶ 25.) Further, "it is proper for a district court to rely on its own familiarity with the legal market" in determining reasonable rates, *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011), and the Court feels comfortable deeming these rates reasonable solely for the purpose of a cross-check.  Some of these rates are, admittedly, higher than those typically charged in labor and employment litigation.  *See, e.g.*, *Pagh v. Wyndham Vacation Ownership, Inc.*, No. 19-cv-00812, 2021 WL 3017517, at *3 (C.D. Cal. Mar. 23, 2021) (noting that "for Los Angeles attorneys who practice labor and employment law," partners charge an "average hourly rate of between $456 and $716, and associates between $345 and $540" and that "paralegals in the labor and employment practice area earn an average hourly rate between $142 and $227").  Even so, the concern is mitigated given that the contingent nature of wage-and-hour litigation in representative actions generally warrants a risk multiplier.

Multiplying the timekeepers' rates by the hours expended yields $150,150.  The $66,837.83 award calculated under the percentage-of-the-fund method is just under half of this lodestar amount.  The risk multiplier needed to get between the two amounts is well within—indeed, it is below—the range of reasonable multipliers.  *See Vizcaino*, 290 F.3d at 1051 & n.6 (approving of evidence that "the range of multipliers applied in common fund cases" was "0.6–19.6, with most (20 of 24, or 83%) from 1.0–4.0 and a

bare majority (13 of 24, or 54%) in the 1.5–3.0 range"); *id.* n.6 ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." (alteration in original) (quoting *In re Prudential Ins. Co. Sales Pracs. Litig.*, 148 F.3d 283, 341 (3d Cir. 1998)). Thus, in the Court's judgment, the lodestar cross-check confirms the reasonableness of the amount awarded under the percentage-of-the-fund method.

## F.    Incentive Awards

"At its discretion, a district court may award an incentive payment to the named plaintiffs in a FLSA collective action to compensate them for work done on behalf of the class." *Selk*, 159 F. Supp. 3d at 1181. In determining whether an incentive award is appropriate, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Id.* Incentive awards typically range from $2,000 to $10,000. *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015) (collecting cases); *see also In re Toys R Us-Del., Inc.-Fair & Accurate Credit Transactions Act Litig.*, 295 F.R.D. 438, 470 (C.D. Cal. 2014) (explaining that California district courts typically approve incentive awards between $3,000 and $5,000). A $5,000 payment is "presumptively reasonable." *Bellinghausen*, 306 F.R.D. at 266.

The settlement agreement provides for an incentive award for Reed equaling $5,000. (*See* Agmt. ¶¶ 2(m), 24(a).) Reed asserts that she was involved in providing information verbally to counsel regarding Bridge Diagnostics and collecting and producing records to counsel and that she faced the risk of stigma and liability in bringing this action. (*See* Dkt. 30-3 [Declaration of Plaintiff Krystal Reed in Support of Motion FLSA Settlement Approval and Approval of Service Payment, Adminstration (sic) Fees

and Attorneys' Fees and Costs] ¶¶ 4–5.)  The Court finds that the presumptively reasonable $5,000 incentive award is appropriate here.

## IV.  CONCLUSION

For the foregoing reasons, Reed's motion is **GRANTED IN SUBSTANTIAL PART**.  The Court further **ORDERS** as follows:

A.  The Court appoints Krystal Reed as the settlement collective representative.

B.  The Court appoints Bisnar Chase LLP and the Law Office of Michael L. Fradin as settlement collective counsel.

C.  The Court appoints the Simpluris, Inc., as the claims administrator.

D.  The Court approves the settlement agreement and the terms and conditions of settlement set forth therein, (Dkt. 30-1 Ex. 2), subject to the subsequent amendment by the parties, (Dkt. 34 Ex. A).

E.  The Court approves $10,200 in costs for the claims administrator.

F.  The Court approves $20,948.70 in costs and $66,837.83 as fees for settlement collective counsel.

DATED:     June 13, 2023

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE